Our second case for this morning is Jones v. LaPorte County Sheriff's Department and others. Good morning, Your Honors. May it please the Court, my name is Rick Jekus. I represent Michael Jones, the plaintiff in this case. This is an appeal from a grant of summary judgment in an employment discrimination matter. Retaliation and ADA claims are the critical elements here. I had toyed with the idea of opening my argument with the statement that Officer Vance made to my client on the elevator which triggers this series of events. I thought I might get a gavel hurled at me if I did. So instead, I want to focus on the effect of that kind of racist statement, and that's the only word I can use for it, as it colors the rest of this case. Because it comes into play in several respects. First of all, my client goes to the jail... But before you get into this, as I read the briefs, we have now boiled this case down to two things. One, the question whether his loss of his job was the result of unlawful retaliation. And two, whether his loss of his job resulted as a violation of the Americans with Disabilities Act. Because even though he was a qualified person with a disability, allegedly, there was a breakdown in the accommodation process. So I realize, reading through the briefs, there's a lot of discussion of underlying incidents that might perhaps have been also the subject of a race discrimination claim. But that's not really what we have now. Right? I mean, it seems to me we're at retaliation and ADA. But the question remains whether that information, that evidence of race discrimination, is relevant. I understand that you... I mean, I'm not saying you can't use it, but the retaliation... So what is your theory of the retaliation? Is it just the loss of the job, or is it anything else? There is more to the retaliation than just the loss of the job. But I think part of that is an issue that has not been decided in the courts of appeals. And that is whether the intentional papering of the file with manufactured evidence or actual witness intimidation, whether those would be discrete acts of retaliation, actionable acts, materially adverse acts. But why are they adverse as long as they're just sitting there in the file, even if they're completely phony, but nothing is happening? You know, why don't we need to wait until there's a lack of a promotion or until there's a firing or until there's something concrete? Because under White, as I understand White, if the employer's actions would dissuade a reasonable person from bringing an action, then those decisions, the things that the employer does would be actionable. And if an employer is going to go to the extent of actually threatening witnesses, papering a file, creating false evaluations, that would dissuade any reasonable employee from ever making a claim. And ultimately, this is coupled with Jones's termination, termination of his job. But even standing alone, I think these are the types of actions that are just so extreme that they amount to a retaliation claim in and of itself. So are you trying to argue that somehow all of this activity in the workplace is dissuading him from using the Sheriff's Department internal complaint processes? I'm just trying to get this to go from the events that you're talking about to the retaliation. And the line of cases you're talking about, White, talks about the severity of what's happened. You know, if somebody walks into your office and says, boy, you look horrible today, I mean, people – it's not a nice thing to say, but people brush that sort of stuff off. If they come in and do something much more significant, then maybe that's the kind of thing that would deter an employee of ordinary fortitude, et cetera, from raising a complaint. So I just – I need to tie this together somehow with what you think the retaliation was. Well, I think it would dissuade a reasonable employee from using – You know, and I think part of the problem are the gaps in terms of when these different incidents occur. Because some of the gaps are more than a year or, you know, five or six months. Or like, you know, he becomes a supervisor in June of 2010. Then 4-11, he gets a reprimand on inadequate documentation. And then it's like six months later, this comment. And then a year later, the first FMLA leaves. So part of the problem is how do you – you know, these are like discrete acts, but they're not in a short time frame or, you know, he doesn't get fired after any of those or threatened to be fired. I mean, I think that's what Judge Wood is trying to get at. And that brings up how these things interconnect. What we have, the filing of the EEOC complaint, it's received by the employer on February 9th of 2012. On the 10th, there's this meeting between the employee, the employer's heated meeting, followed by Mr. Jones going to Sergeant Vance, the same fellow who ordered the elevator comment, asking for a radio, necessary part of his equipment, and being told to get that out of his office. Within the next week, you have Sergeant Vance authoring an employee evaluation that is never seen or signed by Mr. Jones that's referencing Jones's accusations of workplace racism, including the one that he himself is involved in. So even though the statement itself precedes all of this by a couple of years, it's still on Mr. Vance's mind within literally days after the receipt of the EEOC charge when all of this artificial evidence starts pouring into the file. You get the phony write-up. You get the so-called investigation of the skillet comment, where Mr. Jones is reassured that, no, that was just a term of endearment, according to the Urban Dictionary. And we did a thorough investigation of that, and we documented all of that in the file, and then we get the file, and it turns out that they documented the wrong file. They actually forgot who it was that made the statement and wrote up a different individual, undoubtedly because they did this so long after the fact, actually after the EEOC charge, that now what we have is a, at least what a reasonable jury could conclude, is a papering of the file to make it look like you were actually conducting investigations, investigating internal complaints, when, in fact, you were not doing anything of the sort. Probably the best evidence you have is the whole lack of accommodation and the timing of the July 11th review of the doctor's letter, and then HR informing him he's unable to accommodate his return. But then that kind of also spills over into the ADA claim, because in light of Dr. Israel's restrictions, how was Jones shown he can perform the essential functions of the job with an accommodation? I see my time's up. Your time's up. You should answer the judge's question. Yes. I agree, Your Honor, that this is a continuing action, and these claims, although they are discreet on paper, they're all part of the same series of facts. The retaliation that's going on is going on right up until the point when they should have been engaging in the interactive process and didn't. But the essential function, one of the essential functions the county says, is they have legitimate safety concerns about needing an officer to stay over in a crisis and not to leave mid-shift. Do you think that's legitimate? It may be legitimate, but we don't know the full extent of that, because there was no interactive process. They shut down this process after a 10- to 15-minute investigation that didn't even involve determining the decision-makers' reading of the doctor's letters. They did nothing. They shut this thing down because they wanted to. Okay. Thank you very much. Thank you, Your Honor. Ms. Bruner. Good morning. Good morning. I just want to revisit where Mr. Gick has left off with regards to the accommodation matter. What we have here under the ADA is an obligation on the part of an employer to determine whether or not there are any appropriate accommodations once they've been noticed that an employee has a known limitation, is core mental, and has requested an accommodation as Mr. Jones did in this case. So is it your view that it's really Dr. Israel's letter that sets out at least Mr. Jones's proposed accommodations? That is correct, Your Honor. And those proposed accommodations were only for two days. Dr. Israel asked that these particular four limitations or restrictions be imposed, and in fact they were reasonable on their face not only because it was for just two days that he was asking for these restrictions, but also because Mr. Jones was already in what was considered a floater position at the time that this request was made by Dr. Israel. The floater position had him dedicated to the processing or booking areas, which would have then permitted him to not be near the hanging cell, the incident, the cell where the hanging occurred, would have also been one where if he did need to leave, if his post-traumatic stress syndrome symptoms manifested, there was a person in processing who could have relieved him. So, therefore, that's reasonable on its face. So before you go further, I just wanted to say that the letter from Dr. Israel, I can see how you might read it as simply a two-day restriction, but it's a little ambiguous. Yes, Your Honor. I assume your response must be that under the ADA, if they had concerns actually about any of the four restrictions, it was up to them to come back and say, you know, restrictions one and two look okay, but three and four we have trouble with, how about doing this instead, or something along those lines. That is absolutely correct, Your Honor. And in Sears, this court also reaffirmed that basically an employer cannot sit behind a closed door and reject the employee's request for an accommodation without explaining why the accommodation requests were rejected and offering alternatives. Here we know that there were alternatives in addition to the fact that we believe that these requested accommodations were reasonable because of the two-day restriction, because there was no overtime, so the fact that available because of budgetary constraints, which was evidence in the record testified to by the sheriff himself, the request that he not be required to work more than one shift was reasonable on its face. And this court has said that when the employer has failed to engage in an interactive process to determine whether there's any feasibility to the accommodations or even whether there are any alternative accommodations, this employer has essentially flunked its obligations under the ADA. In this particular case, where there is evidence in the record that the accommodations requested were reasonable and the employee was terminated or denied an opportunity to be availed of these accommodations, that summary judgment is inappropriate and that the employee should have been given an opportunity to produce the evidence at trial to prove that these accommodations were reasonable and feasible. If I may, on the retaliation claim, I also wanted to explain how under Ortiz, this court has recently said that the bottom line question is, is there enough evidence before us to determine whether the employee's protected conduct ultimately informed and influenced the adverse act? In this case, while there are many adverse acts in between and wrongful conduct by the bottom line is that this employee was set up for termination and ultimately terminated as a result of the- As a result of what? Filing the EEOC charge, going to human resources to begin with? What was the protected act? The protected act was initially him complaining about race discrimination, both internally and also later with the EEOC. So whether you want to start with his protected conduct that he engaged in in 2010 or whether you want to look at just what occurred in February 2012 when he filed his two charges on the 1st of February and the February 15th charges where he is relating back to how his workplace life has just changed materially and adversely by his immediate supervisor, Vance, and his supervisor, Captain Bell, as a result of the contrived performance evaluations, the demotions, the refusal to accommodate, all of which ultimately set him up for termination. Well, that first, when he filed the first charge, it was like nine days later they did accommodate him by changing his status to a floater based on his eye issues. Yes, Your Honor. And then when the evaluation was done, the evaluation referenced back to that period when he had eye problems. And there was reference to the typos. And it specifically referred to those typos that covered that period when it appears he was having eye problems. Right. So that, just in terms of accuracy of that evaluation. Yes, but that evaluation, which occurred in the same meeting in which they discussed how to accommodate his vision impediment, is when later Sergeant Vance began to criticize his work performance and his attitude and claimed that he had, and issued him a written reprimand regarding his work performance. And so you already started to see how this continued hostility was continuing or informing the actions of his immediate supervisor. Also, he was denied the radio at that time, even though everyone else had a radio, working radio. And this absence of the working radio ultimately. Okay. Thank you. I'm sorry. My time is up. Thank you very much. All right. Thank you very much. Ms. Zdarsky. May it please the Court. Your Honors, there's been much discussion about Animus on the part of Sergeant Vance. So we'd first like to point out that Sergeant Vance was not the decision maker with respect to the termination of Mr. Jones's employment. But what if Sergeant Vance was responsible for all of the negative material in the file that led the Sheriff's Department to end Mr. Jones's employment at the end of the FMLA leave, instead of working with him for an accommodation or allowing some kind of voluntary separation or taking any of many other steps that would have been less draconian? If I understand Your Honors' question correctly, it refers to the papering the file argument that plaintiff is making. That first assumes that there is some connection between these evaluations or write-ups and the ultimate adverse action, the termination. And here it is not as if this was a case of progressive discipline, where evaluations and write-ups form a foundational basis for the termination. Mr. Jones was terminated simply because he did not and could not return to work after the expiration of his FMLA leave. Well, but you're making an assumption there that seems to me contested on this record. You've got Dr. Israel's letter. You have his efforts, actually, to reach out to people in the Sheriff's office. The letter doesn't read to me like an ultimatum. The letter reads like, here are things I think are going to work. I'm going to look at them in two days. As I said, I think it's ambiguous to know exactly how long he thinks it will last, but why bother to reevaluate if that's your final word? And it's a mystery why the Sheriff's department didn't come back and say, you know, we have concerns about having him leave at the minute of the last shift, even if we don't think he would need to work a full additional shift, and we, you know, whatever they would say, which I know spills over into the ADA, but you are, I think, assuming as a fact, and the record may not support this, that there can be no dispute that the end of the FMLA and his quote-unquote inability to work is the reason he's not kept on. You don't even furlough him. You don't allow him to resign. You don't do anything. Your Honor, if this is in reference to the retaliation claim and setting aside for a moment the ADA failure to accommodate a portion of this. But you blended them yourself just now by saying that it's the end of the FMLA when he was unable to continue working, and I'm saying that even that's not clear. And there's all of this. What Mr. Jones has done is he's shown time and again that your own regulations require certain things, such as either a signature on an evaluation or a signature of somebody else saying that the person refused to sign, that various types of discipline should be in files and none of it's there, reason to believe that these things are just thrown in later. That sounds as though somebody is being set up to be released as soon as the first opportunity to do that arises, i.e. retaliation for filing, let's say, the EEOC charge. So if I may answer your Honor's question in two parts. First, that again assumes that these people making the evaluations or the write-ups were involved in the accommodation decision. And, in fact, the record is clear. I'm trying, as you just suggested, not to talk about accommodation. I'm trying to say that he files the EEOC charge, this cascade of retaliatory behavior follows the filing of the EEOC charge, and these people, whether it's Vance, whether it's Bell, are larding up the file with things. And so when he goes out on his FMLA leave, after he's been commended for his role in averting the suicide, and he's got a little PTSD afterwards, and I'm sure it's a very upsetting thing to be involved with that, instead of working with him, because now you've got the stage all set to get rid of him, you get rid of him instead. Your Honor, all of these factors, these actions, must relate back to the decision-maker with respect to the adverse response. I understand that. And the decision-maker is relying on the file. No. The decision-maker, actually, the record is clear that the decision-maker, whether it's Chief Deputy Sosinski or Joyce Leon, the Director of Human Resources, did not rely on any of Mr. Jones' evaluations or write-ups. Is there any record that the Sheriff's Office fires everybody who goes out on FMLA leave? No, Your Honor. That is not contained in the record. All right. I didn't think so, since that would violate the law. So anyway. There's nothing in the record to demonstrate, though, that this procedure was, in fact, any different from any employee who had not made a complaint of discrimination. But there we do have to blend over to the ADA, because to look at those modest restrictions that Dr. Israel suggests in his letter and says, please call me, you know, whatever, he tries to call and his phone calls aren't answered. To assume from that that you're dealing with a person who's completely disqualified from continuing to work is a big jump. I'm not sure that the record supports that. Your Honor, it's not a big jump. As Your Honor was concerned, there was no way the department could accommodate a jailer having to leave anyway. But there was no discussion about it. You can't stand here and say there was an interactive process, right? No. Because as soon as the letter came, he was fired. So there was no discussion whatsoever. And let me suggest one accommodation. So there they see that element of the letter, don't have him work double shifts. The department says, wait a minute, you know, an incident may arise where there's some spillover, and maybe Dr. Israel modifies that to say, don't have him work two pre-scheduled double shifts, but he is released if he needs to stay over to finish up a matter that's underway for as long as is necessary before another person can be brought in who's presumably started their new shift. You know, it's very easy to see how that modification could be tweaked to meet the department's legitimate concern. And there may be similar tweakings of the other, you know, the department could say we're not going to do this permanently, but we're willing to do a trial run of two weeks, you know, or something like that. And then we'll see whether he, in fact, has proven to be able to continue with the job. Because some form of leave is a type of accommodation under the law. So to simply look at that letter and say, oh, no accommodations, is unrealistic. Your Honor, there are ways to hypothetically come up with ways that some employer could accommodate this. And that's why this department didn't come back to Mr. Jones and Dr. Israel and say what you've suggested doesn't seem workable to us, but here is something that we would counteroffer. Nothing like that happens. That is not the reason the department did not do that, Your Honor. How do I know that? They didn't do it, and there's a duty under the ADA to do that. Your Honor, the interactive process does not come into play unless first Mr. Jones demonstrates that he was a qualified individual, and he has not made any effort, whether through argument or evidence, to demonstrate that he could have performed his essential functions of his job with or without a reasonable accommodation. I think he has presented precisely that kind of evidence. He has said, if I got the accommodations that Dr. Israel was suggesting, I could do the job. He doesn't know. I mean, you can't ask him to do this against every possible thing that the world could imagine, but he has indeed said I could do it this way. Maybe there are other ways he could do it too. Plus, Sosinski said that he might have to work overtime, but the county had budgetary restrictions on overtime at the time. You agree with that? Yes, Your Honor. And the letter didn't say Jones was incapable of managing traumatic events. It only said he was to have limited exposure to the one cell where the traumatic event occurred. That's correct, Your Honor. So limited doesn't mean zero. It doesn't, but Jones' restrictions weren't viewed separately. They were viewed in the aggregate as they were intended. And setting aside those restrictions, but looking precisely at the restriction that he must be allowed to leave at any time his symptoms arise. The jail could not accommodate that restriction. As Chief Deputy Sosinski noted, that's a safety concern, both for inmates and for other jailers, whether it was two days or 20 days. But the restriction itself may have just been a two-day restriction, and you could have given him two more days of leave, for that matter, if you didn't want him at the jail. I don't see anything in Dr. Israel's letter or his approach, again, that says that it's an ultimatum, that it's an all or nothing. The county took it that way because they wanted to get rid of him, apparently. But that's not satisfactory. First, Your Honor, if this were as to the ADA claim, whether the county wanted to get rid of him is irrelevant. Animus is not a factor under the ADA failure to accommodate. But to find that because they didn't engage in the interactive process, in this case, they're somehow liable, would turn the interactive process into an independent basis of liability. But we'll see the problem, too, when you go back to the root of why he even had this problem. He had this problem because he was the only guard without a radio. That's incorrect, Your Honor. The record makes clear that he was not the only guard without a radio, and unfortunately, the record demonstrates that this was a widespread problem with equipment issues within the jail on the radio's repeater and that radios were breaking faster than the jail could replace them. Mr. Jones was not singled out, unfortunately. But he didn't have the radio at the time, and this traumatic event became even more traumatic because of the lack of the radio, and so he should be faulted for the department's shortage of flashlights. I mean, of radios, rather. And I think there are some disputed facts about this because the department immediately finds a radio for him right after this event. Somebody could infer that maybe they could have found one before, too. I mean, he's just as—it's like flipping a coin. I mean, he's no more likely or less likely than any other guard to encounter another similar situation. I'm sure they don't happen every day at the jail. So suddenly, boom, there's a radio. Certainly that is a fact that we're forced to accept at the summary judgment stage. However, there's no basis to assume that because he got a radio, the inability to provide him with a radio earlier was an act of retaliation. And it is important to note— Except that Jones says that when he asked Vance for a radio, you told him to get the hell out of his office. I mean, that's his testimony. I understand you wouldn't agree with that, and so he didn't say we have a shortage of radios. Sorry. He didn't, and that's correct, Your Honor. But it is also important to note that all of these allegations, these animus, these alleged bad acts, they are entirely divorced from the decision-maker and the decisions which were made, whether it's Chief Deputy Sosinski's decision that Mr. Jones could not return to work or whether it's the decision of Joyce Leone that he was out of FMLA leave. They're only divorced if the FMLA leave itself has nothing to do with that, and I think the link that he's trying to show is that if he had been given the radio, if he had been given the counseling that he got the last time he was exposed to an attempted suicide, the FMLA leave itself might never have happened. Your Honor, obviously traditional principles of causation apply, and that asks that the department assume that it doesn't give him a radio and then can presume that because it doesn't give him a radio, he can't respond to incidents, and because he can't respond to incidents, he's going to get PTSD, and because he's going to get PTSD, he's going to go on leave, and his FMLA leave is going to expire and he's not going to be able to return. That kind of connection is absurd. There's also no evidence, though, that the inability of the department to provide him with a radio, however unfortunate, was retaliatory. This was a widespread problem. Mr. Jones hasn't presented any evidence that people who did not make complaints of discrimination were treated any differently. To address a few misstatements of the record that are critical to this determination, obviously all of the factors, the mosaic factors, for lack of a better term, the ambiguous statement. We're trying to abolish mosaics. Exactly. Unfortunately, for whatever term, the ambiguous statement, suspicious timing. Why don't you just say the evidence taken as a whole? That's what we're trying. Circumstantial, direct, just the evidence. The evidence taken as a whole is all designed to demonstrate causation, a retaliatory animus that led to the ultimate adverse action, and here there is no connection for causation in this case. There's no animus on the part of the decision makers who made that determination. With respect, if I may briefly address the EEOC's claim as to whether Mr. Jones was qualified, perhaps there was a misunderstanding of the record, but there's been no evidence that Mr. Jones could have performed his duties as a jailer. There's, in fact, no evidence that the Department could have accommodated him in booking any kind of activity. The Department said all he was doing was floating around and cleaning floors and doing something so trivial that they put inmates in on it, so it seems to me your position is a little contradictory. If his job was really that easy to perform, then surely he could have performed it with the restrictions Dr. Israel put on him. Your Honor, I see that my time has expired. Please answer. That's not, in fact, correct. But you said, I mean, I didn't make that up, though. You said it in your brief. In our brief, the time frame, I think, may be helpful. Initially, Mr. Jones was doing janitorial duties. That position was eliminated, and Mr. Jones was transferred to the position of a jailer. Once his initial request for accommodation came in for his visual restrictions, he was then made a floater. A floater is not the same as the janitorial duties that he had been doing, but is a backup person, a person that's to respond to incidents involving other jailers. So it wasn't as if he was doing trivial tasks as a floater, but a floater is there to assist whenever needed. And that's precisely why he could not be accommodated as a floater, because at any time a floater is needed to respond. Okay. Thank you very much. Thank you. I believe that both appellants used up all their time, but Mr. Gekas, if you want one minute, I will allow you to respond. And we promise not to ask anything, so it won't go over. Thank you, Your Honor. Just a couple of points that were made. Animus not being a factor in the ADA, good faith is a factor. And when there is evidence of animus, that really complicates the issue of whether a person could be acting in good faith. It raises a genuine issue of fact as to whether good faith was even going on. And certainly bad faith in the interactive process is destructive of the ADA accommodation process. The connections between Vance's bad acts and the ultimate decision. Vance has, again, all of Vance's information is going through Bell. Bell is saying that he's directly involved with Sosinski in making that decision. So the testimony is mixed on that. Sosinski is denying that he talked to anybody or looked at anything. But Bell says, yeah, I talked to Sosinski. I told him about all this. So there are questions of fact as to all of this. And those questions of fact under Ortiz, those simply create something for a jury trial. Thank you. All right. Thank you very much. Thanks to all counsel. We'll take the case under advisement.